RUBY MINTON AND EVA L. SIMPSON *v.* ROY
McGOWAN ET UX

5-6142                                    490 S.W. 2d 136

Opinion Delivered February 12, 1973

*Eugene Sloan,* for appellants.

*Henry S. Wilson,* for appellees.

CARLETON HARRIS, Chief Justice. The question in this
case is whether the chancellor, at the conclusion of
appellants' case, properly sustained a demurrer to the
evidence.

E. A. McGowan, the owner of an eighty-acre hill
farm in Craighead County, died in 1933. His wife,
Annie McGowan, continued to live on the property,
which was the family homestead, until 1951, at which
time she passed away. Roy McGowan, who, with his wife,
are the appellees, was born upon, and has lived his entire
life, upon this property, here in controversy. Appellants,
Ruby Minton and Eva L. Simpson, married and moved

away from the farm in 1924. Following their mother's death, in 1952, appellants consulted an attorney in Jonesboro with reference to the fact that Roy held drainage district deeds under which, according to appellants, he was claiming title. No action, however, was taken, and Roy continued to live on, and to farm, the property. In June, 1970, all the heirs of E. A. McGowan except appellants, deeded their interest in the property to Roy, and on September 10, 1970, appellants instituted suit in the Craighead County Chancery Court seeking partition of the lands, alleging that they were two of the seven children of E. A. McGowan and each asked that her one-seventh interest in the lands be set apart or the lands sold wherein they could derive their proportionate shares. After a demurrer had been overruled, appellees filed an answer asserting that they had acquired title to the property by adverse possession. Thereafter, appellees moved for summary judgment, but this motion was also denied, and the case proceeded to trial.

At the conclusion of appellants' case, counsel for appellees demurred to the evidence, the court sustaining the demurrer, and accordingly entering its decree finding that appellees had acquired title by adverse possession and that appellants had no right, title or interest in the lands. From the decree so entered, appellants bring this appeal.

Since this case involves a demurrer to the evidence, it is the duty of the trial court to give the evidence its strongest probative force in favor of the plaintiff and to rule against the plaintiff only if his evidence, when so considered, fails to make a *prima facie* case. *Werbe* v. *Holt,* 217 Ark. 198, 229 S.W. 2d 225. At the time the plaintiff completes his case, it is not proper for the court to weigh the facts, and the motion should be denied if it is necessary to consider the weight of the testimony before determining whether the motion should be granted. *Pults* v. *Pults,* 236 Ark. 434, 367 S.W. 2d 120; *Neely* v. *Jones,* 232 Ark. 411, 337 S.W. 2d 872.

In the instant litigation, though portions of the testimony by appellants favor the position of appellees, we are still of the view that appellants offered some evidence presenting factual issues for determination. For instance, Charles P. Simpson, husband of appellant Eva L. Simpson,

testified that following the death of the mother in 1951, while still at the cemetery, he asked Roy if an administrator shouldn't be named while the heirs were there all together. He said that Roy answered that there wasn't any hurry and he (Roy) would take care of the matter later on and wouldn't make any charge. He testified that he next talked with Roy about getting the estate wound up in 1957, at which time he told the latter that he wanted to build a house on his wife's part of the land for a home; that Roy responded that he did not have it in shape to divide it up, and walked away. The witness said that he next talked with Roy at the cemetery following the Ace Puckett funeral[1] in 1962, at which time Roy said that he "hadn't got it ready". The witness stated that he also talked to Roy several times in 1963 when the latter came to the house to sell butter and eggs, and that Roy gave the same answer.[2]

In 1964, Simpson testified that he told Roy that he, (Simpson) was in the market for a cow and he went to the farm with this appellee to look at a cow. According to Simpson, Roy said he wanted $200.00 for the cow.

> "I said, 'Well, that's a little high but being you need to sell her and we need one pretty bad I believe I'll do that'. He said, 'Well, you'll have to have your wife sign a deed to her part of the estate' and I said, 'Well, I wouldn't give that for the cow without the $200.00' so right then we went back to the house and that was all."

According to Simpson, Roy did not, during any of these conversation, state that he owned or was claiming the property as his own. The witness quoted his last conversation, in April or May of 1970, with Roy when appellee came to his home to ask Eva to sign a deed, as follows:

> "I might not get all of the words but he said to her 'What do I do to get you to [deed] your part of that place?' and she said, 'What do I get out of it?' and he

[1]Ace Puckett was a brother-in-law, the husband of a sister of his wife.

[2]According to an affidavit made by Simpson on November 1, 1971, in connection with the motion for summary judgment, this occurred in November or December of 1963, Simpson stating that the conversation took place "soon after the assassination of President Kennedy".

said, 'You ain't going to get nothing' and he said 'I'll make you' and I said, 'Wait, I'll get in there now'. I said, 'You won't make my wife do nothing' and I said, 'What do you want to give her?' and he said, 'I wouldn't give her very much. It wasn't worth—I believe he said—$350.00 when he took it over. He said, 'It wasn't worth much'. He said, 'I wouldn't give much' and I said, 'Well, just a little won't get it'. He said, 'Well, I'll sue her. I'll make her that way'."

Simpson testified that after about two weeks, since Roy did not institute suit, appellants filed a complaint.

It will be noticed that, from the conversations related, Roy McGowan never contended to Simpson that he owned the property, having acquired it by adverse possession, and it will be noted that the conversations reported broke the continuity of seven years adverse possession. However, there is even stronger evidence presenting a fact question offered by Burl G. Slaven. This witness testified that he was planning on constructing a road running between the McGowan, Rogers, and Slaven land to aid public travel and he had already spoken to Rogers and an aunt seeking to obtain a thirty foot right-of-way. From the record:

"I was going to get 30 foot from each side of the line and build a road and try to get Bill Clark to maintain it for us and he said if I would get a right-of-way he would see what he could do about it. He never did commit himself either way and I went down and asked Roy—'Poss', I know him as Poss better—and I asked him could we have a right-of-way 30 foot across there to put a road through there so my sister could build a house back there. She wanted a house back there and that was the reason for building the road and he said he couldn't let me have it because it wasn't his."

Slaven testified that, to the best of his recollection, this had happened two or three years before the trial.

R. A. Slaven, uncle of Burl, and a cousin of Roy and appellants, testified that he had over the years visited with Roy McGowan and that the two had hunted and fished together; also that Roy had worked for him "off and on"

for approximately twenty years. He said that he had talked with Roy at different times about the property and that Roy had never claimed to own the place, "about all he ever said was he paid the taxes on it."

In *Montgomery* v. *Wallace,* 216 Ark. 525, 226 S.W. 2d 551, we said:

> ". . . In order that adverse possesson may ripen into ownership, possession for seven years must be actual, open, notorious, hostile, exclusive, and it must be accompanied with an intent to hold against the true owner."

Of course, the cited testimony disputes the acts necessary to acquire adverse possession, for, to say the least, a factual issue is presented as to whether Roy McGowan intended to hold adversely against his sisters. In addition, we have said that stronger evidence of adverse possession is required of a cotenant where a family relationship exists than is required against a stranger. *Johnson* v. *Johnson,* 250 Ark. 457, 465 S.W. 2d 309. Also, evidence of an adverse holding must be very clear where the original entry is by permission. *Dial* v. *Armstrong,* 195 Ark. 621, 113 S.W. 2d 503.

For the reasons herein stated, we are of the view that the court erred in sustaining the demurrer to the evidence, and the decree is accordingly reversed, and the caused remanded to the Craighead County Chancery Court for further proceedings not inconsistent with this opinion.

IT IS SO ORDERED.

BYRD, J., concurs.

CONLEY BYRD, Justice, concurring. This controversy as it presently appears before us is a procedural battle and. in writing the majority opinion the author has emphasized, as he should, those facts that are strongest in favor of appellants. Thus the reversal here may be only a Pyrrhic victory—*i.e.* by winning this battle on procedure, the appellants do not necessarily win the lawsuit. There is other cogent evidence in the record to show that appellants have been denied possession of the lands in

excess of seven years and if this matter had been presented on a question as to the weight of the evidence, I would be inclined to hold on the record before us that a preponderance of the evidence shows that appellee had held the lands openly, notoriously and adversely for more than seven years.

Therefore, I respectfully concur.