Ruby MINTON and Eva L. SIMPSON *v.*
Roy McGOWAN et ux

74-42                                    510 S.W. 2d 272

Opinion delivered June 10, 1974

*Eugene Sloan,* for appellants.

*L. D. Gibson,* for appellees.

J. FRED JONES, Justice. This is an adverse possession case in which Ruby Minton and her sister, Eva L. Simpson, appeal from a chancery court decree in favor of their brother, Roy McGowan, wherein the chancellor held that McGowan had obtained title to the parties ancestral estate consisting of 80 acres by adverse possession. This is the second appearance of this case before us. On the first appeal *Minton & Simpson* v. *McGowan,* 253 Ark. 945, 490 S.W. 2d 136, the chancellor sustained McGowan's demurrer to the evidence presented by Minton and Simpson. We concluded in that case that Minton and Simpson "offered some evidence presenting factual issues

for determination," and we held that the chancellor erred in sustaining the demurrer to the evidence and remanded the case for further proceedings.

The facts, as more specifically set out in our original opinion, reveal that E. A. McGowan was the owner of 80 acres of land when he died in 1933 leaving surviving him, his wife Annie McGowan and seven children including the parties to this action. As pointed out in our previous opinion, Roy's two sisters, Ruby and Eva, married and moved away from the farm in 1924, but Roy remained on the farm with his mother following his father's death, and has continued to live on the farm since his mother's death in 1951.

In 1952 the appellants Ruby Minton and Eva Simpson, together with others of the E. A. McGowan heirs, consulted an attorney in Jonesboro concerning drainage district deeds under which, according to them, Roy was claiming title to the property. No action was taken, however, and Roy continued to live on the farm and in 1970 obtained deeds from all the heirs except the appellants. On September 10, 1970, the appellants, Minton and Simpson, instituted the present action for partition.

In a discovery deposition Mrs. Minton said she is 66 years of age; that she married R. C. Minton when she was 17 years of age and that they lived about a mile from the land here involved, until her husband's death about six years ago. She said Roy had lived on the farm all his life and that following her father's death Roy farmed the place and rented it out, but never did pay any rent to her. She said her mother died in 1951 and she had only been on their homeplace twice since then. She said that following her mother's death she and all the other heirs gathered at the homeplace in the fall of 1951 and talked with Roy about dividing the land, but that no division was made. She said she was on the place the second time when a brother-in-law died about eight or nine years ago. She said all of the family and heirs were present on that occasion but that she was only present for a short time and does not recall anything being said at that time about dividing up the land. She said that after she participated in the discussion with Roy McGowan in 1951 about dividing up the land, she

and some of the other heirs talked with attorney Joe Barrett in Jonesboro about partitioning the land. She said at that time they discussed with Mr. Barrett, Roy McGowan's contentions that he had obtained some storm and sewer drainage district deeds to the property and was claiming to own the place. She then testified as follows:

> "Q. So in 1951 and 1952 you knew that Mr. Roy McGowan was claiming this place was his?
> A. Well he had made mention that it was his and I made mention it was mine.
> Q. You talked to Mr. Barrett about a partition suit?
> A. Yes, we talked it.
> Q. Did you ever file any action prior to this action to partition the land?
> A. No.
> Q. From 1951 or 1952 until today, you haven't done anything about the dividing of the land?
> A. He hasn't—I haven't—only I have told him that I would like to have my portion.
> Q. And he has told you that it is his land?
> A. Yes, before Ma's passing he told me that but it was my mother's until she died, wasn't it?"

Mrs. Simpson also testified by discovery deposition. She said that Roy continued to live on the land and continued to farm and rent it out after their father's death. She denied knowing anything about delinquent improvement assessments. She said she was present at the meeting in 1951 when all the heirs met with Roy and discussed a division of the property. She said she was also present at the meeting with attorney Barrett. She said that after they had asked Roy to divide the place and he had refused to do so, they talked with Mr. Barrett about getting the place divided because Roy was claiming to own all of it. She denied knowing anything about delinquent drainage district assessments on the property. She said their conference with Mr. Barrett was some time in the fall of 1952 and she then testified as follows:

> "Q. And what you told Mr. Barrett was that Roy was claiming it as his own?
> A. Yes.

Q. And since then Roy has continued to remain in possession of it and continued to claim it as his own, hasn't he?
A. Yes.
Q. And you have never received any of the benefits from it?
A. No."

The appellee, Roy McGowan, testified that he married in 1924 and continued to live on the land with his parents until his father's death in 1932 and his mother's death in the spring of 1951. He said that following his father's death the land became delinquent for improvement district assessments, and he discussed the delinquencies with his sisters and requested them to help in the payment of the delinquency. He said they refused to help with the payments so he borrowed the money on a note endorsed by Richard Slaven and paid the assessments and took deeds from the drainage district. He said the first deed was dated February 1, 1936, and that he later obtained another deed from the same district to him and his wife as grantees dated October 15, 1941. He then testified as follows:

"Q. And so Richard Slaven—the gentleman back here— endorsed your note so that you could borry [sic] the money to pay the taxes on this land after your sisters told you that they weren't going to pay them and that you could pay them and have the land?
A. That's right."

An affidavit of A. R. Slaven was introduced into evidence in which Mr. Slaven, who was a cousin to the parties, said Roy McGowen had worked for him at a sawmill and had stated he thought he should have the property here involved because he had taken care of his mother and had paid taxes on the property. He also said he discussed with Roy the matter of giving right-of-way for a road across the McGowan land and Roy stated he didn't have anything to give because the property did not belong to him. Other interested witnesses testified to statements made by Roy indicating that he knew the property did not belong to him, and indicating he was not claiming it as his own, but all of these statements were emphatically denied by Roy.

The appellants correctly point out that stronger evidence of adverse possession is required of a cotenant where a family relationship exists than is required against a stranger. *Johnson v. Johnson,* 250 Ark. 457, 465 S.W. 2d 309. As we pointed out in *Johnson,* the relationship between such cotenants is one of trust and confidence and in order for possession of one such tenant in common to be adverse to his cotenants, it is necessary for him to bring home to his cotenants the knowledge of his hostile claim either directly or by acts so notorious and unequivocal that notice must be presumed. The chancellor in the case at bar was in a better position than we are to evaluate the witnesses and reconcile the conflict in their testimony and where the chancellor's findings and decree are not against the preponderance of the evidence, this court will affirm. *Fisher v. Fisher,* 237 Ark. 321, 372 S.W. 2d 612.

According to appellant Minton's and Simpson's own testimony, they knew the appellee Roy McGowan was claiming possession adversely to their interest as early as 1951 in any event. When such possession is actual, open, notorious, hostile, exclusive, and accompanied with an intent to hold adversely against the true owner for the statutory period of seven years, then such adverse possession ripens into good title. *Montgomery v. Wallace,* 216 Ark. 525, 226 S.W. 2d 551.

We are unable to say that the chancellor's findings and decree are against the preponderance of the evidence.

The decree is affirmed.